# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 04-2473

_____

Tetyana Ignatova,                    *
                                     *
            Petitioner,              *
                                     *
      v.                             *   Petition for Review of an Order of
                                     *   the Board of Immigration Appeals.
Alberto R. Gonzales[1],              *
Attorney General of the             *
United States,                       *
                                     *
            Respondent.              *

_____

Submitted: October 14, 2005
Filed: December 19, 2005

_____

Before ARNOLD, MURPHY, and GRUENDER, Circuit Judges.

_____

MURPHY, Circuit Judge.

      Tetyana Ignatova, a native of Russia and citizen of either that country or Ukraine, and her minor daughter, a native and citizen of Ukraine, entered the United States as nonimmigrant visitors in September 1994. Ignatova later applied for permanent resident status on the basis of her July 1995 marriage to a United States citizen, James Wells, but the marriage was dissolved before she gained nonconditional

_____

[1]Alberto R. Gonzales, the current Attorney General of the United States, is substituted as respondent pursuant to Federal Rule of Appellate Procedure 43(c)(2).

permanent resident status. She filed an application for a hardship waiver and claims for asylum and for relief under the Convention against Torture. The Immigration Judge (IJ) found Ignatova not credible and denied all claims, and the Board of Immigration Appeals (BIA) affirmed. Ignatova now petitions for review. We deny the petition.

Although Ignatova and Wells separated in 1995, Ignatova filed an I-130 petition in January 1996 in order to obtain permanent resident status based on her marriage to an American citizen. The petition should have included her husband's signature, but it did not. Ignatova and her daughter were nevertheless granted conditional permanent resident status in May 1996, and Ignatova sought removal of the conditional status by filing what should have been a joint I-751 petition in March 1998.

A joint interview for Ignatova and Wells was scheduled for September 1998. Ignatova requested that the interview be postponed because her marriage was in the process of being terminated, and the marriage was dissolved after Ignatova and Wells filed for divorce in January 1999. Ignatova had an interview with the Immigration and Naturalization Services (INS)[2] in February 1999 and then filed a new I-751 petition in March to remove conditions on residence requesting a hardship waiver of her conditional status, under Immigration and Nationality Act (INA) § 216(c)(4), 8 U.S.C. § 1186a(c)(4), based on her alleged good faith marriage and its recent termination.

In October 1999 the INS notified Ignatova that it intended to deny her petition to remove conditions on residence because of inconsistencies between her interview and the supporting documentation she submitted. It also informed her that its Fraudulent Document Laboratory suspected that Wells' signature on the first I-751

---

[2]The INS was abolished and its functions assumed by the Department of Homeland Security on March 1, 2003.

petition had been forged. Ignatova did not respond to the allegations. Her conditional resident status was terminated and her petition denied after the INS found that she had not entered her marriage in good faith. Thereafter, the INS began removal proceedings by filing Notices to Appear, charging *inter alia* that the termination of Ignatova's conditional permanent resident status made her deportable under 8 U.S.C. § 1227(a)(D)(i). Seven hearings were held between April 13, 2000 and November 27, 2002.

Ignatova chose not to file for asylum while her I-751 petition was pending. She received oral and written warnings early in 2002 about the consequences of filing a frivolous application, and in April she submitted an application for asylum under INA § 208, 8 U.S.C. § 1158, withholding of removal under INA § 241(b)(3), 8 U.S.C. § 1231, and protection under Article 3 of the Convention. The application included allegations that she had been targeted for persecution because she was Jewish and celebrated Jewish holidays. Ignatova claimed that the door to her home in Ukraine had been set on fire and that she had suffered verbal and physical assaults, including antisemitic remarks and one attack which required hospitalization. A hearing was held on this application in November 2002.

The INS found that Wells' signature on the initial I-751 was a forgery (even Ignatova's expert had concluded that it was probably not his signature). Also in the record was a declaration of Wells which indicated that he had met Ignatova in April 1995 and resided with her for about three months before marrying her, that he had never seen the I-130 Form she submitted, that he had been coached by Ignatova during the INS interview and lied about residing with her, and that he had not signed the I-751 form. Wells' testimony at the November hearing on the I-751 was consistent with this declaration. He testified that he had married Ignatova at a friend's request and that they never filed joint tax returns, owned mutual property or accounts, or had sexual relations. Ignatova's testimony differed from his on a number of points. She claimed she had not known who needed to sign the I-130 form, that Wells had intended it be

3

filed, that she had left the I-751 for Wells to sign, and that she had no role in creating his signature. She admitted that she had not resided with Wells in 1996.

During another immigration hearing Ignatova supplied further information about her asylum claim. She claimed that the police had refused to get involved when she tried to report several of the antisemitic attacks on her and that her husband in Ukraine divorced her because of the effect on his business. She also stated that she was a practicing Christian and admitted that her family had hidden its Jewish background. She submitted a hospital record to show she had been injured in one of the attacks, but a letter from the hospital denied that Ignatova had received the treatment described in her submission or that the hospital employed the doctors listed in it or used the stamps and seals attached to it. The INS filed a motion seeking a finding by the IJ that Ignatova had knowingly filed a frivolous asylum application.

The IJ issued an order on April 4, 2003 denying Ignatova's applications for a hardship waiver under 8 U.S.C. § 1186a(c)(4)(A), asylum, withholding of removal, relief under Article 3 of the Convention, and voluntary departure. The decision ordered that Ignatova and her daughter be removed to Russia or alternatively to Ukraine. The IJ made an adverse credibility finding against Ignatova based on her testimony and conduct about her marriage claim and on her claim to be Jewish and "harmed for the reasons she claimed". The IJ indicated relief was denied for both the mother and daughter because of Ignatova's lack of credibility. Ignatova was found ineligible for a hardship waiver because of her sham marriage, her failure to show extreme hardship, and Wells' failure to sign the I-130 form. The failure to file a proper I-130 meant that Ignatova actually never had valid conditional permanent resident status. The asylum claim failed because Ignatova and her daughter had failed to file within the one year period permitted for asylum applications, and no tolling of the period would be appropriate, since her marriage was a sham. Moreover, her application would not have been timely even with tolling. The IJ found that Ignatova had knowingly filed a frivolous application for asylum and that Ignatova herself was therefore ineligible for any benefits under the INA.

4

In May 2004 the Board of Immigration Appeals affirmed. It upheld the adverse credibility finding against Ignatova and concluded that she had not satisfied her burden of proof on the persecution and torture claims, that her asylum application was time barred based on the lapse of over one year before filing and her failure to qualify for an exemption, that the asylum application was frivolous, and that Ignatova had not demonstrated her eligibility for a hardship waiver. Ignatova now petitions for review.

Ignatova seeks to overturn the BIA's order of removal. She argues that she should have been granted asylum and nonconditional permanent residency and that there was insufficient evidence to justify the finding that she filed a frivolous asylum application. She also seeks as alternative relief the reinstatement of voluntary departure.[3] The government responds that this court lacks jurisdiction to review the determinations made about the timeliness of her asylum application and her eligibility for a hardship waiver. The credibility findings underlying the denial of asylum should be upheld it argues, as well as the finding that Ignatova frivolously submitted an asylum application.

Ignatova challenges the denial of her application for a hardship waiver. We first consider whether we have jurisdiction in light of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104-208. Under 8 U.S.C. § 1186a(c)(4) the Attorney General has discretion to "remove the conditional basis of the permanent resident status for an alien[,]" and to decide "what evidence is credible and the weight to be given that evidence." "The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General." Id. This grant of discretion is bolstered by IIRIRA's limitation on the jurisdiction of courts to review decisions or actions of the

---

[3]In a letter submitted pursuant to Fed. R. App. Proc. 28(j), Ignatova urges that the court consider her claims for withholding of removal and relief under the Convention, but neither claim was argued in her appeal brief and they were therefore waived. See Harstad v. First American Bank, 39 F.3d 898, 905 (8th Cir. 1994).

Attorney General which are specified under this subchapter to be in his discretion unless they involve relief under § 1158(a). 8 U.S.C. § 1252(a)(2)(B).

Ignatova asserts that we should exercise jurisdiction over her hardship waiver application under 8 U.S.C. § 1252(a)(2)(D), a provision added by the Real ID Act of 2005, Pub. L. No. 109-13 (2005). The IJ found Ignatova ineligible for a hardship waiver based on her sham marriage, her failure to demonstrate extreme hardship, and Wells' failure to sign the I-130 form. Since we lack jurisdiction to review questions of fact underlying discretionary decisions of the Attorney General, see 8 U.S.C. §§ 1186a(c)(4), 1252(a)(2)(B), we are without jurisdiction to review the denial of the hardship waiver in this case.[4]

Ignatova challenges the denial of her asylum application on timeliness grounds. The Board found that Ignatova had not complied with the one year filing requirement imposed by 8 U.S.C. § 1158(a)(2)(B). Almost eight years passed between her entry in September 1994 and the submission of her asylum application in April of 2002. Although courts lack jurisdiction to review determinations concerning exceptions to the right to apply for asylum under 8 U.S.C. § 1158(a)(3), see also Begna v. Ashcroft, 392 F.3d 301, 303 (8th Cir. 2004); Ismailov v. Reno, 263 F.3d 851, 855 (8th Cir. 2001), Ignatova attempts to invoke our jurisdiction by asserting that the timeliness of her application raises a question of law that is reviewable under the Real ID Act's grant of jurisdiction, Pub. L. No. 109-13, § 106 (2005), 8 U.S.C. § 1252(a)(2)(D). She claims that the question of whether "'extraordinary circumstances' existed" to permit

---

[4]We recognize that some courts have found jurisdiction to review an eligibility ruling under 1186a(c)(4)(B) which requires a threshold determination of whether there was a good faith marriage. See Cho v. Gonzales, 404 F.3d 96, 102 (1st Cir. 2005). The focus here was on an adverse credibility determination, however, so our case more closely resembles Urena-Tavarez v. Ashcroft, 367 F.3d 154, 159-61 (3d Cir. 2004) (holding that the denial of waivers under 8 U.S.C. § 1186a(c)(4) is not subject to judicial review). Moreover, we would have to take note of the substantial evidence that Ignatova and Wells did not enter marriage in good faith if we had jurisdiction.

a late filing pursuant to 8 U.S.C. § 1158(a)(2)(D) is a question which we have jurisdiction to decide. Under the statutory framework, however, the decision whether such circumstances exist is a discretionary judgment of the Attorney General. See 8 U.S.C. § 1158(a)(2)(D) (the applicant must demonstrate extraordinary or changed circumstances "to the satisfaction of the Attorney General"). Such discretionary decisions continue to be unreviewable by this court. See Vasile v. Gonzales, 417 F.3d 766, 768 (7th Cir. 2005).

Ignatova further contends that there was not substantial evidence that she filed a frivolous asylum application. Ignatova alleges that the IJ made no findings of her intent in filing the application and failed to account for her testimony that she was ignorant of the manner in which the document was completed. She urges that the decision to deny her any future immigration benefits must be reversed because it is not supported by the evidence. The government does not contest jurisdiction over this question.

A determination that an applicant has submitted a frivolous asylum application carries serious consequences. Under 8 U.S.C. § 1158(d)(6) an alien who has been found by the Attorney General to have knowingly made a frivolous asylum application after having received notice of the consequences of filing a frivolous application "shall be permanently ineligible for any benefits under this chapter." The IJ's finding that Ignatova filed a frivolous application rested on another finding, that was the finding that Ignatova had submitted a fraudulent hospital record to bolster her claim of persecution. Ignatova's submission described treatment allegedly given to her by certain doctors and bore stamps and seals, but the record contains a letter from the hospital denying that those doctors were employed there, that the stamps and seals were authentic, or that Ignatova had been treated there. Ignatova argues that the hospital letter cannot form the basis of an adverse credibility determination because there was no evidence that she knew or suspected the document was a forgery, citing Kourski v. Ashcroft, 355 F.3d 1038 (7th Cir. 2004). In this case, however, the IJ explicitly found that the document submitted by Ignatova was fraudulent. Ignatova

7

has never provided any explanation about the discrepancy between her account of treatment for injuries resulting from persecution and the hospital's letter. After our review of the record, we conclude there was substantial evidence to support the determination that Ignatova filed a frivolous asylum application.

In sum, we conclude that the removal order is valid. If the Attorney General finds that a petitioner has not entered a proper qualifying marriage, he must terminate the permanent resident status of the alien. 8 U.S.C. § 1186a(b)(1). That termination was accompanied by the INS charge, sustained by the IJ, that Ignatova was deportable under 8 U.S.C. § 1227(a)(1)(D)(1). Because the record supports the finding of removability and because we lack jurisdiction to review the denial of a hardship waiver or the denial of voluntary departure, see 8 U.S.C. § 1229c(f), we affirm the order of removal and deny the petition for review.

_____